IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| LISA DUNAVIN | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | FILE NO. _____ |
| CRESA GLOBAL INC. | : | |
| | : | |
| | : | <u>JURY TRIAL DEMANDED</u> |
| Defendant. | : | |

## **<u>COMPLAINT</u>**

COMES NOW Plaintiff Lisa Dunavin ("Plaintiff" or "Dunavin") and files this Complaint against Defendant Cresa Global Inc. ("Defendant" or "Cresa") seeking recovery of damages and other appropriate relief for employment discrimination on the basis of Plaintiff's sex (female) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; on the basis of Plaintiff's age (61) in violation of the Age Discrimination in Employment Act, 29 U.S.C.A. § 621, et seq.; and based on unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a).  Plaintiff respectfully shows the Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1.

This is an action for damages in excess of $75,000.00 exclusive of attorney's fees, cost, and interest.

2.

Plaintiff is a former employee of Defendant and is a citizen and resident of the State of Georgia.

3.

Defendant Cresa Global Inc. is a foreign profit corporation that, at all times relevant hereto, has transacted business in Georgia and within the Northern District of Georgia.

4.

Defendant may be served with process by serving a copy of the Summons and Complaint on its Registered Agent, CT Corporation System, 289 Culver St., Lawrenceville, GA 30046, within Gwinnett County, Georgia.

5.

At all times during Plaintiff's employment with Defendant, Plaintiff was employed as the Market Leader for Cresa's Atlanta office in Atlanta, Georgia.

6.

Cresa (or its predecessor) has maintained an office in Atlanta, Georgia continuously since 1998.

7.

For many years, and on a continuous basis, Defendant has had customers and clients in Georgia, solicited and formed business relationships in Georgia with Georgia residents and businesses, represented the interests of clients with respect to commercial leasing needs and properties in Georgia, executed and benefited from contracts in Georgia, earned substantial revenue in Georgia, recruited and employed hundreds of employees in Georgia, paid taxes in Georgia, and advertised in Georgia.

8.

 Defendant's actions in recruiting Plaintiff, prior to her employment, occurred in Georgia.

9.

Plaintiff's employment was procured through an offer letter that was negotiated and executed in Georgia.

10.

Defendant engaged, employed, and contracted with Plaintiff with the understanding and desire that Plaintiff would work in Defendant's office in Georgia, where Defendant employs some 40 people.

11.

Plaintiff's work activities for Defendant occurred entirely in, or substantially in Atlanta, Georgia.

12.

All, or substantially all, of the workplace interactions, communications, conduct, and decision-making at issue with respect to Plaintiff's claims herein occurred in Atlanta, Georgia.

13.

The violations of Plaintiff's civil rights giving rise to Plaintiff's claims, the actions resulting in those violations, and Plaintiff's damages and injuries therefrom occurred in Georgia.

14.

At all times relevant hereto, upon information and belief, Defendant has employed more than twenty (20) employees who were/are located in Georgia.

–4–

15.

Plaintiffs claims herein are based on her employment in Georgia, the conditions of employment in Georgia, and her ultimate discharge from employment in Georgia and, therefore, arise out of Defendant's contacts with and in this forum.

16.

Defendant, at all times relevant hereto, has purposely availed itself of the benefits and protections of Georgia law; and this court's exercise of personal jurisdiction over Defendant in this matter is consistent with principles of justice and fair play.

17.

The United States District Court for the Northern District of Georgia has subject matter jurisdiction over this action.   Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 and/or § 1332(a)(1).

18.

This Court has personal jurisdiction over Plaintiff and Defendant.

19.

Venue is proper in this judicial district because Defendant is subject to personal jurisdiction in this district and a substantial part of the events or omissions

giving rise to the claim(s) occurred within this district.   28 U.S.C. § 1391(b)(2) and/or (3) and (d).

### 20.

Plaintiff has satisfied all conditions precedent to the filing this action.   On May 13, 2020, within 180 days of the challenged discriminatory conduct, she timely filed a charge of discrimination with the EEOC alleging sex discrimination, age discrimination, and retaliation in connection with her termination.   On November, 12, 2020, the EEOC issued a Right to Sue; and Plaintiff timely commences this action within ninety (90) days of her receipt of said Notice of Right to Sue.

### 21.

Defendant is an employer as defined under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"), and thus it is unlawful for Defendant to engage in employment discrimination on the basis of sex, age, or retaliation for statutorily protected activities and/or opposition.

## **FACTUAL BACKGROUND**

### 22.

Cresa is a commercial real estate firm headquartered in Washington, D.C. with 1,000+ employees during all times relevant hereto and 80+ offices worldwide.

–6–

23.

Cresa has advertised itself as "the world's most trusted occupier-centric commercial real estate firm."

24.

On March 22, 2019, Dunavin was offered a full-time employment position with Cresa as the Market Leader in the Atlanta office.   She accepted the job and began working on April 29, 2019.

25.

Dunavin came to Cresa as an experienced veteran held in high regard within the commercial real estate industry.

26.

Dunavin had last been employed at Cushman & Wakefield, where she was a successful and respected Senior Managing Director.   Dunavin agreed to take a job at Cresa involving potentially less pay because she was led to believe that she would have a meaningful opportunity to lead the Atlanta office and earn equity.

27.

Dunavin reported to the Atlanta Executive Committee, which at all relevant times consisted of Bubba Chrismer, Tom Tindall, and Jim Byrd.

28.

Most of Dunavin's day-to-day reporting interactions were with Jim Byrd ("Byrd"), a co-founder, Managing Principal, and Executive Committee member. Dunavin worked closely with Byrd.

29.

Within the first few days of her employment at Cresa, Byrd said to Dunavin "so, you're 60, right."   It seemed that Byrd must not have been aware of how old Dunavin was at the time she was hired.   A couple of months later, this comment was repeated by Tom Tindall, an Executive Committee member, during Dunavin's first one-on-one meeting with him.

30.

In connection with Dunavin's recruiting and interview efforts on Cresa's behalf, Byrd often desired to know the age of candidates under consideration – information Dunavin would not have known.

31.

At one point, Byrd asked Dunavin how old a particular female candidate was. When Dunavin replied that she did not know and could not legally make such an

inquiry, Byrd took offense.   He insisted on an answer and said that "surely you must have some idea."

32.

Byrd had a habit of talking down to Dunavin.   This was not how he treated his male colleagues.   He would say things to Dunavin like "you just need to sit there and listen."   Dunavin also experienced unexpected resistance and hostility from Byrd when she asked a question or made suggestions.

33.

Byrd demeaned and undermined Dunavin and minimized her role and status in front of co-workers and support staff.   He would preface various (sometimes superfluous) comments made aloud with the condescending proviso "if Lisa does her job…"

34.

Byrd's treatment of Dunavin in front of others sometimes confused the staff, who indicated or complained to Dunavin that they were uncertain as to whom they reported.

35.

Likewise, support personnel tended to copy both Byrd and Dunavin on emails that did not need to be directed to Byrd.  This was likely because email senders were uncertain who the proper recipient was (when there should have been no uncertainty).

36.

Byrd tended to inject himself into decisions and responsibilities that were not his to make or carry out, but Dunavin's, as the Market Leader.

37.

Dunavin asked Business Manager Paula McBryde, who worked closely with Byrd and who also served in an HR role, to advise Byrd to stop his undermining comments in front of staff.

38.

Dunavin was informed upon being hired that Byrd would continue to oversee accounting responsibilities for the first 2-3 months of Dunavin's tenure due to some ongoing problems.

39.

Dunavin respected that directive and related timing; however, when three months came and went and Dunavin began asking accounting-related questions, at one point, Byrd told her "not to worry about it or she would lose all that pretty hair."

40.

The hostility Dunavin felt from Byrd grew into palpable antagonism. Employees in the office were aware of this.

41.

Dunavin addressed Byrd's conduct directly with him as early as three weeks into her job.   Byrd responded "I know. I'm an asshole. I'll try to do better."

42.

Byrd's workplace behavior towards Dunavin never demonstrably improved. It worsened over time.

43.

In July of 2019, Byrd and Dunavin were having a conversation in the office conference room in connection with recruiting efforts for new support positions.

44.

During that conversation, they were discussing a female, African American candidate named Shere Williams.   Byrd said to Dunavin **"*we do not like to hire women or blacks because it sets us up for a lawsuit*."**

45.

Dunavin initially relayed Byrd's comments and her concern about them to Paula McBryde.   Thereafter, Dunavin relayed the comments and concerns to multiple people within the company, including Cresa's HR consultant Charlene Pickus and CEO Jim Underhill.

46.

Byrd made another disturbing comment during recruiting efforts in July of 2019.   Cresa needed to hire three or four employees to assume roles as Client Coordinators.   One of these hires would ultimately be working in the "back room" conference room that was occupied by Rhett Delk, Alex Dunlap, and Will Poplin -- all Caucasian male employees.

47.

McBryde, Byrd, and Dunavin were discussing the candidates under consideration and Dunavin made the suggestion that Shere Williams would be a

good hire and could bring some heightened professionalism and diversity of experience.

48.

Byrd cautioned that the guys in the back are "a fraternity that works well and we do not want to disrupt it."

49.

McBryde quickly agreed that "we do not want to rock the boat" and Byrd told Dunavin that it was best for her "not to try to change things."

50.

At a subsequent point during discussions about candidates, Byrd shouted his objection to another female candidate favored by Dunavin.  When Dunavin expressed disagreement with Byrd's characterization of the candidate, Byrd yelled out that he "will use whatever word he likes" and for Dunavin "not to tell him otherwise."   Byrd repeated the comment loudly two more times.

51.

McBryde, who heard the exchange, later that day told Dunavin in her office that she was embarrassed by it.

−13−

52.

During that private conversation, Byrd entered the room and placed his hand on the back of Dunavin's neck to keep her from leaving the room.

53.

Byrd attempted to explain his earlier outburst, however, the entire episode was beyond awkward and inappropriate.   It was a physical affront.

54.

The outburst by Byrd and his exchange with Dunavin was similar to another, earlier exchange.   Dunavin was recommending consideration of a female candidate; and Byrd remarked "find me a woman with a finance degree" -- suggesting that finding a woman with a finance degree would be a challenge.

55.

In September, 2019, Dunavin shared her concerns about Byrd's ongoing misconduct with Joseph Grace, a Principal in the Atlanta office who was concerned about Dunavin.

56.

Dunavin learned that Grace had relayed her complaints about Byrd to others within the company.

57.

Dunavin also complained about Byrd's offensive and sexist conduct to Lisa Fry, an Executive Vice President, who relayed Dunavin's complaints to CEO Jim Underhill.   Underhill later suggested to Dunavin that it might be time for Byrd to "retire."

58.

At a small group meeting involving a number of Cresa managers and executives that occurred during a Cresa conference in Chicago in October of 2019, Dunavin complained about Byrd's conduct (including the *blacks and women* comment) to Richard Rhodes, a Senior Managing Principal in Cresa's D.C. office. Rhodes then addressed Underhill, the CEO, as he walked by the table where Dunavin and Rhodes were sitting – asking "have you heard this" while repeating the *blacks and women* comment.   Underhill nodded but did not respond.

59.

On October 28, 2019, after another occasion involving contentiousness and yelling by Byrd, an employee named Janet Stover, who was present at the time, told Dunavin that she was embarrassed by the exchange.

60.

When Dunavin left the room and returned to her office, Byrd followed her inside and shut the door.  Dunavin told Byrd that she had never been treated so poorly in her 30 years in the business; that Byrd's behavior had grown too intolerable for her to take any longer; and because of Byrd's conduct, Dunavin would be resigning.

61.

Byrd responded "well, that's just stupid" and threatened "do you want to know what I am going to tell people?"   Dunavin responded "no" and left the room.

62.

Tom Tindall later showed up at Dunavin's office and stuck his head in to inform her that she did not have to work directly with Byrd anymore.

63.

Tindall asked Dunavin if she would meet with Bubba Chrismer and him the next day.  That meeting ultimately occurred the following Monday.  At the meeting with Tindall and Chrismer, on November 4, 2019, Dunavin relayed complaints about Byrd's conduct and hostility towards her and told them about the

"women and blacks" comment and the "fraternity" comment.   Dunavin also described the occasion where Jim placed his hand on her neck.

64.

Not denying Byrd's conduct and propensities, Tindall and Chrismer at one point suggested that Dunavin's problems with Byrd were due to her "misunderstanding" about Byrd.

65.

Ultimately, Tindall and Chrismer persuaded Dunavin that she would be protected from Byrd's hostile behavior and would not have to report to him.   Thus, Tindall and Chrismer convinced Dunavin not to resign.

66.

Dunavin was led to believe that Byrd would be removed from the Executive Committee, in recognition of the fact that her exposure to Byrd in small, group meetings needed to be minimized.

67.

However, Byrd was not removed from the EC; and Dunavin was instructed to "get past it."

68.

It wasn't long after the November 4, 2019 meeting that Dunavin received new criticisms from Tindall, was disinvited from a corporate meeting that had previously required her attendance, and was accused of making "negative" comments in the office.

69.

Further, Dunavin returned from the year-end holidays to learn that her assistant, Erica Hoggatt, had been replaced without consulting Dunavin.

70.

In early 2020, Dunavin was notified that the EC wanted to defer her 2019 bonus review for ninety days due to Dunavin's "rocky" start.   Dunavin was also questioned regarding whether she was willing to "get into the trenches" – skepticism that had never been voiced to Dunavin before.

71.

On February 3rd, Dunavin responded to the EC's intent to defer her 2019 bonus review by requesting that Cresa adhere to the terms provided in Dunavin's hiring offer letter, so that they could put 2019 behind them and start 2020 fresh. Dunavin reiterated her commitment to Cresa's future success.

72.

On February 5, 2020, Dunavin was notified to attend a meeting on February 7, when Duavin was terminated, effective immediately.   She was told the reason was the EC had decided that the Market Leader position was no longer "justified."

## COUNT I
## (Title VII Sex Discrimination)

73.

Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

74.

Defendant terminated Plaintiff's employment unlawfully on the basis of her sex and/or her failure to conform to stereotypes regarding women.

75.

Plaintiff has suffered damages as a result of Defendant's sex discrimination. As a result of Defendants' discriminatory conduct, Plaintiff suffered lost wages and benefits (past, present, and future) and diminished future employment opportunities. Plaintiff seeks to recover back pay and front pay wages and lost benefits.

76.

Plaintiff has also suffered emotional distress and mental anguish as a result of

Defendant's actions in violation of Plaintiff's rights.

77.

Plaintiff is entitled to an award of back pay and benefits, front pay, compensatory and punitive damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

**COUNT II**
**(Title VII Retaliation)**

78.

Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

79.

By complaining to Byrd, executive management, and HR of gender-based misconduct and discrimination and other conduct unlawful under Title VII, Plaintiff engaged in protected activity under Title VII.

80.

Plaintiff was terminated because she complained and engaged in activities protected under Title VII.

–20–

81.

Defendant's retaliation has caused Plaintiff to suffer both monetary and non-monetary damages, including severe emotional distress.

82.

Plaintiff is entitled to an award of back pay and benefits, front pay, compensatory and punitive damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

**COUNT III**
**(Age Discrimination)**

83.

Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

84.

At all times relevant hereto, Plaintiff was over 40 years of age.

85.

At the time she was terminated, Plaintiff was sixty-one (61) years old, and qualified for the position of Market Leader or another similar position within Cresa.

–21–

86.

Upon information and belief, Plaintiff's duties are now being handled by Jim Byrd and/or other male employees retained by Cresa at the time of Plaintiff's termination.

87.

Defendant's decision to terminate Plaintiff's employment was because of and/or motivated by Plaintiff's age.

88.

Defendant's violations of the ADEA were intentional and willful.

89.

As a direct and proximate result of the foregoing violations of the ADEA, Plaintiff has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other benefits, lost interest on those wages and other benefits, and loss of any potential opportunity to advance within Cresa.

**COUNT IV**
**(Punitive Damages and Expenses of Litigation)**

90.

Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

–22–

91.

The actions of Defendant complained of herein evidence such willful misconduct, wantonness, malice, oppression, and an entire want of care which would raise a presumption of conscious indifference to the consequences thereof. Such conduct was committed with reckless indifference to Plaintiff's federally protected rights so as to make appropriate the imposition of punitive damages on the Defendant.

92.

An award of reasonable attorneys' fees and costs expended by Plaintiff in the prosecution of this civil action is also appropriate in this civil action in accordance with Title VII and other applicable law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.     Judgment against Defendant for any and all general, special, actual and compensatory damages and equitable relief allowed by law under Title VII of the Civil Rights Act of 1964, as amended, and the ADEA, 29 U.S.C. § 621 including, without limitation, back pay, front pay and damages for emotional pain and suffering on account of the violation of Plaintiff's rights; lost wages, employment

benefits, and other compensation lost to her as a result of Defendant's discriminating against her on the basis of her age, and prejudgment interest;

B.      Liquidated damages doubling the award of interest, wages, lost employment benefits, and other compensation lost to Plaintiff as a result of Defendant's discriminating against her on the basis of his age;

C.      Judgment against Defendant for punitive damages and attorney fees and expenses as allowed pursuant to Title VII and other applicable law;

D.      That all costs of this action be taxed against Defendant;


Respectfully submitted this 29th day of December, 2020.

MOORMAN PIESCHEL, LLC

s/ Christopher G. Moorman
Christopher G. Moorman
Georgia Bar No. 521490
cgm@moormanpieschel.com
*Attorney for Plaintiff*

One Midtown Plaza
1360 Peachtree Street, N.E.
Suite 1205
Atlanta, Georgia 30309
o: (404) 898-1240
f: (404) 898-1241